IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LA-QUN RASHEED WILLIAMS,<br><br>        *Plaintiff,*<br><br>v.<br><br>MRS. STICKNEY, et al.,<br><br>        *Defendants.* | CIVIL ACTION<br>NO. 22-214 |

**PAPPERT, J.**                                                                                          August 21, 2023

## MEMORANDUM

La-Qun Rasheed Williams, a Pennsylvania prisoner proceeding *pro se*, sued prison officials under 42 U.S.C. § 1983, alleging constitutional violations stemming from the fifteen years he spent on the Restricted Release List. He claims in his Amended Complaint that former Secretary of Corrections John Wetzel violated his Eighth Amendment rights against cruel and unusual punishment by keeping him in solitary confinement for a prolonged period; that SCI Phoenix Facility Manager Jamie Sorber, Major Joseph Terra, Unit Manager Thomas Grenevich, Psychological Specialist Joan Stickney and Unit Manager Jaime Luquis violated his Fourteenth Amendment due process rights by not providing Wetzel with information needed to decide whether to release Williams from RRL status; and that SCI Benner Facility Manager Bradley Booher, SCI Benner Superintendent Robert Marsh, Sorber, Terra, Grenevich, Stickney and Luquis unlawfully retaliated against him for filing other lawsuits against prison officials.

The Court denies the motions to dismiss the retaliation claim against Booher, Marsh, Sorber, Terra, Grenevich, Stickney and Luquis and the Eighth Amendment

1

claim against Secretary Wetzel.  The Court grants the motions by Grenevich, Sorber, Luquis, Stickney, and Terra to dismiss the Fourteenth Amendment due process claim because Williams has not alleged that the process he received fell below that required by the Constitution.

I

Williams is a Pennsylvania state prisoner.  Since 2008, he has been on the Restricted Release List ("RRL")—a status assigned to inmates who "pose[ ] a threat to the secure operation of the facility" that cannot be alleviated by transfer to another facility.  DC-ADM 802, § 1(C)(1).[1]  Williams also has a long history of filing lawsuits against prison officials.  *See* (Am. Compl. ¶¶ 20–31).

In February of 2020, Williams was transferred to SCI Benner.  (*Id.* at ¶ 32.)  At a Program Review Committee hearing[2] shortly thereafter, defendants Marsh and Booher told Williams that if he remained misconduct-free for one year, he would be permitted to participate in an RRL step down program.  (*Id.*)  The program allows RRL inmates to earn privileges as they progress through five phases; upon successful program completion, they are placed back into the general population.

Williams did not receive a misconduct during the year that followed.  (*Id.* at ¶ 34.)  But at his PRC hearing, Marsh and Booher told him he would not be allowed to start the step down program because he had multiple pending lawsuits against the

---

[1]     Williams references DC-ADM 802 throughout his Amended Complaint as if it were attached as an exhibit, although the document was not included with his pleading.  Even so, the Court can consider the policy as a "document . . . explicitly relied upon in the complaint . . . without converting [the] motion to dismiss into one for summary judgment."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quotation omitted).

[2]     The PRC reviews RRL inmates' status every ninety days and may recommend removal from the RRL.  DC-ADM 802, §§ 2(D)(5), 4(B)(2).

DOC. (*Id.*) They also told Williams he would be transferred to another facility to start another RRL program to "deter [him] from continuing to file . . . grievances and lawsuits." (*Id.*)

In March of 2021, Williams was transferred to SCI Phoenix "to start a step down/IMU Intens[ive] Management Unit Program." (*Id.* at ¶ 35.) But he did not receive his first step down "homework" assignment until August of that year, (*id.* at ¶ 64), and was not given an official tier/phase assignment until December. (*Id.* at ¶ 66.) Williams alleges Sorber, Terra, Grenevich, Stickney and Luquis prevented him from starting his step down program because of his lawsuits. (*Id.* at ¶¶ 44–45.)

During the same period, Williams alleges he had problems with his annual RRL review. Under the policy in effect at the time, the Secretary of Corrections was responsible for making the final determination regarding RRL placement and release. DC-ADM 802, § 2(D)(10)(a) (eff. 11/14/2016). An inmate's RRL status is reviewed annually:

> The review and approval/disapproval of each inmate's status on the Restricted Release List (RRL) shall be conducted annually. The assigned counselor shall initiate the DC-46 Vote Sheet for purpose of Annual RRL Review at the time of the inmate's regularly scheduled annual review . . . . The Unit Manager shall initiate a Restricted Release List Placement/Annual RRL Review/Removal Request . . . indicating Annual Review and either Request Removal or Continuation on RRL, to be routed at the time of the scheduled annual review. All annual RRL Reviews; DC-46, Vote Sheets; and Restricted Release List Placement/Annual RRL Review/Removal Requests shall be forwarded together to the Corrections Classification and Program Manager (CCPM), Deputy Superintendent for Facilities Management (DSFM), Facility Manager, Regional Deputy Secretary, and the Executive Deputy Secretary for review of the recommendation, indicating approval/disapproval.

DC-ADM 802, § 2(D)(10) (eff. 11/14/2016) (emphasis omitted).  The Restricted Release List Placement/Annual RRL Review/Removal Request Form is then forwarded to the Secretary for final determination.  DC-ADM 802, § 2(D)(10)(a) (eff. 11/14/2016).

   Williams's annual review was scheduled for May of 2021, but he says it did not take place that month.  (Am. Compl. ¶ 36.)  When he submitted request slips to Grenevich and another prison official asking when he would have his review, they told him they had to wait for his psychological evaluation.  (*Id.*)  They also said he would not get an annual review if he continued to file lawsuits.  (*Id.* at ¶ 40.)  Williams submitted two grievances asking for a review, but Grenevich and Stickney allegedly lied to the grievance coordinator, stating the review was completed on May 25, 2021.  (*Id.* at ¶¶ 41, 54.)  The annual review eventually took place in August of 2021, and Wetzel continued Williams's RRL status.  (*Id.* at ¶ 55.)  But Williams claims that the Secretary made the determination without the benefit of seeing his psychological evaluation— which was not conducted until two months later—rendering the review defective under the DOC's policy.  (*Id.* at ¶¶ 56–61.)

## II

### A

   A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the factual allegations in the complaint.  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  When confronted with a 12(b)(6) motion, a district court must conduct a two-step analysis.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, the Court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11.  It "must then determine whether the facts alleged in the

complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The Court must "construe the complaint in the light most favorable to the plaintiff . . . ." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

Section 1983 provides a cause of action against "every person who," under color of state law, "subjects, or causes to be subjected," another person to a deprivation of a federally protected right. 42 U.S.C. § 1983. Government officials cannot be held liable under § 1983 on a theory of *respondeat superior*; a plaintiff must allege the defendant's personal involvement in the alleged violations. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 330–31 (1986).

B

All defendants except Luquis and Stickney move to dismiss on the grounds that Williams failed to exhaust administrative remedies, as required under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). "Failure to exhaust is an affirmative defense the defendant must plead and prove; it is not a pleading requirement for the prisoner-plaintiff" and is therefore not appropriate for resolution at this stage of the litigation. *Paladino v. Newsome*, 885 F.3d 203, 207 (3d Cir. 2018). The Court will consider the exhaustion issue in its role as fact finder at the appropriate time. *Id.* at 211.

III

Williams claims Booher, Marsh, Sorber, Terra, Grenevich, Stickney and Luquis denied him participation in the RRL step down program in retaliation for his lawsuits

5

against the DOC.  (Am. Compl. ¶¶ 34, 44.)  To state a claim for First Amendment retaliation, a plaintiff must allege (1) that he engaged in activity protected by the First Amendment, (2) that he suffered adverse action at the hands of prison officials that would "deter a person of ordinary firmness from exercising his constitutional rights, and (3) that there is a causal link between the protected activity and the adverse action.  *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (quotation omitted) (cleaned up).

Williams alleges that when he arrived at SCI Benner in February, he was told that he could participate in the step down program after going one year without a misconduct. (Am. Compl. ¶ 34).  But a year later, even though he hadn't received a misconduct, Williams was "seen by PRC[,] and Mr. Marsh and Mr. Booher then informed the Plaintiff that he would not start the step down program because Mr. Williams has multiple lawsuits pending against the DOC." (*Id.*)  He also claims he was told he was being transferred to start another program that would deter him from filing lawsuits. (*Id.*)  In March of 2021, Williams was transferred to SCI Phoenix to begin the step down/IMU program. (*Id.* at ¶ 35.)  Williams alleges that at SCI Phoenix, Grenevich told him his annual review had not been conducted because he continued to file lawsuits. (*Id.* at ¶ 40.)  He also alleges that Sorber, Terra, Grenevich, Stickney and Luquis were responsible for denying his participation in the step down program because of his lawsuits. (*Id.* at ¶ 44.)

Filing grievances and lawsuits against prison officials is protected activity, *Gannaway v. Prime Care Medical, Inc.*, 150 F. Supp. 3d 511, 553 (E.D. Pa. 2015), and denying RRL step down participation is sufficiently severe to constitute adverse action.  *Cf. Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (collecting cases).  Williams also

6

claims to have direct evidence of the defendants' retaliatory motive—statements by Marsh, Booher, and Grenevich that Williams was denied step down participation because of his lawsuits—which is sufficient to plead a causal connection. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

Defendants incorrectly argue that Williams fails to plead that they were personally involved in the retaliatory conduct and aware of his lawsuits. Williams alleges that Sorber, Terra, Grenevich, Stickney and Luquis denied his participation in the step down program solely because of his lawsuits. (Am. Compl. ¶ 44.) He also alleges that Booher and Marsh transferred him to another facility to start another program on the RRL, in order to deter him from filing lawsuits. (*Id.* at ¶ 34.) Williams has also alleged that the defendants were aware of his lawsuits. He cites direct statements to him by Booher, Marsh, and Grenevich referencing the suits. (*Id.* at ¶¶ 34, 40.) He also alleges that Sorber and Luquis made statements to participants in a hunger strike which referenced Williams's lawsuits. (*Id.* at ¶ 38.) Finally, he alleges that Terra and Stickney made the decision to deny him participation in the step down program because of his lawsuits. (*Id.* at ¶ 44.)

## IV

In his Amended Complaint, Williams claims that Grenevich, Sorber, Luquis, Stickney and Terra violated his Fourteenth Amendment procedural due process rights by failing to send Wetzel the psychological evaluation with the annual review decision packet.

Williams alleges the annual review of his RRL status should have taken place in May of 2021 but was delayed until August, when he met with the PRC. (Am. Compl.

¶ 55.) While waiting, he filed two grievances requesting a review, but they were denied because Grenevich and Stickney falsely represented that the review took place on May 25th. (*Id.* at ¶ 54.) He also spoke to Grenevich about the delay and was told that they were waiting for his psychological evaluation, as required under DC-ADM 802. (*Id.* at ¶ 53.) Following the August review, Wetzel decided not to remove Williams from the RRL. (*Id.* at ¶ 55.) Williams alleges Wetzel made this decision without the benefit of the psychological evaluation, which was not completed until October 1, 2021. (*Id.* at ¶¶ 56, 61–62.)

"Procedural due process rights are triggered by deprivation of a legally cognizable liberty interest. For a prisoner, such a deprivation occurs when the prison 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Huertas v. Sec'y Pa. Dep't of Corrs.*, 533 F. App'x 64, 66 (3d Cir. 2013) (unpublished) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). "Once [the Court] determine[s] that the interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it." *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000). Where an inmate's RRL status triggers due process protections, periodic "'informal, nonadversary review' at which the prisoner has the opportunity to state his views, satisfies the requirements of due process." *Id.* at 144. Over a decade in administrative custody is an atypical and significant hardship sufficient to trigger the protections of the Due Process Clause, but Williams has not alleged he was deprived of the process due to him under the Fourteenth Amendment. *See Shoats*, 213 F.3d at 143–45.

Williams argues that DC-ADM 802 establishes what forms had to be included in the review packet, and that the prison officials' deviation from the policy was therefore a due process violation. (Pl.'s Resp. in Opp. to Sorber et al. Mot. to Dism. 8, ECF 57.) But "the violation of internal policy alone does not amount to a violation of constitutional due process." *United States v. Fattah*, 858 F.3d 801, 814 (3d Cir. 2017). The inclusion of the psychological examination in the review documents prescribed in DC-ADM 802 exceeds the constitutional minimum requirements of a (1) periodic informal review (2) at which the prisoner has the opportunity to state his views. Williams alleges both that RRL status was reviewed in 2021 and that he met with the PRC. (Am. Compl. ¶ 55.) This is sufficient process. Furthermore, the alleged three-month delay in his annual review was not so long as to deprive Williams of his right to "periodic" RRL status review. *See Hall v. Zaken*, No. 20-1431, 2022 WL 17979664, at *4 n.9 (W.D. Pa. Dec. 6, 2022).

V

Williams alleges that Wetzel violated the Eighth Amendment's prohibition on cruel and unusual punishment by keeping him in prolonged solitary confinement. To plead an Eight Amendment violation, a plaintiff must allege (1) a deprivation that is "objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities;" and (2) a prison official's "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal citations omitted). An official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837.

A

Williams alleges that he is confined to a cell with "no room to exercise or walk around." (Am. Compl. ¶ 72F.) The cell is illuminated 24 hours a day and he is exposed to round-the-clock noise. (*Id.* at ¶¶ 72B–E.) He is left in his cell 24 hours a day on weekends. (*Id.* at ¶ 72G.) Every time Williams leaves the cell, he is strip searched, handcuffed and shackled. (*Id.* at ¶¶ 70*I*–J.) He "is given only 10–15 minutes to eat his meal alone in his cell" and sometimes is not allowed to eat. (*Id.* at ¶ 70C.) Williams can shower only three times per week. (*Id.* at ¶ 72A.) He cannot participate in educational or vocational programs, nor attend communal worship. (*Id.* at ¶¶ 72E–F, M–N.) He is permitted one non-contact personal visit per week. (*Id.* at ¶¶ 70G–H.)

In *Porter v. Pennsylvania Department of Corrections*, 974 F.3d 431, 440 (3d Cir. 2020), the Third Circuit Court of Appeals reversed a grant of summary judgment, holding a reasonable jury could find that prolonged solitary confinement poses an objectively serious risk of serious harm. For thirty-three years, Porter was held in solitary confinement on death row. *Id.* at 436.

> Cells in the C[apital] C[ase] U[nit] are no larger than 7 feet by 12 feet, and are closed with a door that has two narrow vertical windows, measuring 5 ½ inches wide and 36 inches long. The permanent fixtures in Porter's cell include a metal bed with a plastic mattress, a sink, toilet and desk.
> As a CCU inmate, Porter spends the overwhelming majority of his time in his cell, including eating his meals alone. Porter is permitted to leave his cell for ten hours per week, two hours per day Monday through Friday. This includes time for basic hygiene, three showers per week, and for work duty. In addition, Porter is permitted to exercise in the open air five days per week. CCU exercise cages are no more than twice the size of a typical CCU cell, and one or two men are placed in an exercise area at the same time. Porter is permitted one non-contact personal visit per week, and three telephone calls per week. In addition, unless Porter specifically requests a mental health appointment, any medical or mental health

> consultations take place through his cell door, within listening range of prisoners in the surrounding cells.
> On the occasions when Porter is permitted to leave his cell, he must undergo a visual strip search, and is handcuffed from behind, or handcuffed in front using a belt and tether. Job assignments are limited to janitorial duties on the CCU block, and performed in confined small spaces under close observation and monitoring. CCU prisoners are permitted in-cell study, using personal workbooks and reading material, but are otherwise precluded from participation in adult basic education courses, vocational learning opportunities or the chance to work towards a high school diploma. In addition, Porter is not permitted to attend religious services with the general population, but may receive a daily visit from a religious leader, for discussions through the narrow windows of his door.

*Id.* at 436–37 (quotation omitted).

In *Wayne v. Clark*, No. 21-4209, 2022 WL 17993131, at *5 (E.D. Pa. Dec. 29, 2022), a prisoner who spent five years on the RRL satisfied the objective prong at the motion to dismiss stage because he alleged conditions of confinement that, "taken together, [were] equivalent to solitary confinement":

> For the last five years, Wayne has been held in a cell equipped with a light that is illuminated 24 hours a day. The cell has scant natural light. The only window is narrow, tinted, and too small to view the outside world. He is locked in the cell for 22 hours a day. He is allowed two hours of exercise outside each day in a small pen with no exercise equipment.
> Wayne must eat meals alone in his cell. He is allowed approximately 15 minutes per meal. Each time he leaves his cell, he is subject to mandatory strip and body cavity searches. He is allowed three showers a week. He is not allowed any contact visits. His commissary privileges are restricted, allowing him to buy only certain items.

*Id.* (internal record citations omitted).

Wetzel argues that the Court should apply *Batchelor v. Little*, No. 22-1340, 2022 WL 16749039 (E.D. Pa. Nov. 7, 2022), which distinguished *Porter* and held that the prisoner, who had been on the RRL for four years, did "not adduce evidence" at summary judgment showing "his confinement created a substantial risk of serious harm." Although Batchelor experienced many of the same conditions as Porter and

11

Wayne, the court held his RRL placement was not equivalent to solitary confinement because Batchelor could "move through program phases with good behavior to earn privileges." *Id.* He also had more frequent opportunities than Porter to connect virtually with the outside world, and his cell was only illuminated from 6:00 a.m. to 9:00 p.m. *Id.*

The conditions of confinement Williams alleges in his Amended Complaint are more like those in *Porter* and *Wayne* than the less extreme conditions in *Batchelor*, which, again, was decided at summary judgment, not the motion to dismiss stage. His fifteen years on the RRL fall in the middle ground in terms of magnitude. Most importantly, although Williams acknowledges that at certain points he could—and did—earn privileges, (Am. Compl. ¶ 34), he also alleges that during some periods of his confinement, he did not have the opportunity to do so. (*Id.* at ¶ 18.) These allegations are sufficient to satisfy the objective seriousness prong.

### B

An inmate "may demonstrate deliberate indifference by showing that the risk of harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past such that defendants must have known about the risk." *Porter*, 974 F.3d at 445 (quotations omitted). Williams claims that Wetzel was "well aware of" scholarly research showing the "severely negative impact of long term solitary confinement on mental health." (Am. Compl. ¶¶ 83–85.) As a result, Williams alleges he suffered psychological damage, including anxiety, depression, and suicidal thoughts. (*Id.* at ¶ 87.)

In *Porter*, the Third Circuit noted that "[i]n a past case, Defendant Wetzel conceded . . . long-term solitary confinement poses serious risks," *id.* at 445 (citing *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 779 (M.D. Pa. 2016)); that the risks of solitary confinement are obvious, well-documented by "a wide range of researchers and courts," and publicly acknowledged by correctional officers, *id.* at 446; and that the Pennsylvania DOC's policies "specifically recognize the mental health risks posed by solitary confinement." *Id.* *Porter* did not hold that prolonged solitary confinement is a *per se* violation of the Eighth Amendment—in evaluating the subjective prong, courts may consider whether prison officials had a legitimate penological justification for keeping the plaintiff in solitary confinement. *Id.* But at this stage of the litigation, Williams has stated an Eighth Amendment claim based on his fifteen years in solitary confinement.

## VI

Defendants argue that they are shielded by qualified immunity. "[O]fficers are entitled to qualified immunity . . . unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quotation omitted). At the motion to dismiss stage, "the plaintiff is entitled to all reasonable inferences from the facts alleged, but also those that defeat the immunity defense." *Benzman v. Whitman*, 523 F.3d 119, 125 (2d Cir. 2008); *accord Dennis v. City of Phila.*, 19 F.4th 279, 284 (3d Cir. 2021).

The retaliation defendants purport to rely on the "clearly established" prong to support their qualified immunity argument. But their contentions boil down to a

13

challenge to the constitutional violation prong. As explained in Part III, *supra*, Williams has sufficiently pleaded that the retaliation defendants violated his First Amendment right to access the courts.

Wetzel argues that it is not clearly established that being in RRL status for several years, with the opportunity to earn privileges and work toward release from the RRL, is an Eighth Amendment violation. But "it is well-established in our Circuit that such prolonged solitary confinement satisfies the objective prong of the Eighth Amendment test and may give rise to an Eighth Amendment claim . . . ." *Porter*, 947 F.3d at 451. As discussed above, Williams alleges prolonged confinement under conditions equivalent to solitary confinement. Discovery may reveal that *Porter* is not on all fours with the particularized circumstances of this case, but at this stage of the litigation, the Court cannot conclude that Wetzel is shielded by qualified immunity.

An appropriate Order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.
