### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LA-QUN RASHEED WILLIAMS,

<em>Plaintiff,</em>

  v.

STICKNEY, et. al.,

<em>Defendants.</em>

CIVIL ACTION
NO. 22-214

---

**Pappert, J.**                                             **July 31, 2025**

<u>MEMORANDUM</u>

During his nearly three decades of incarceration, La-qun Rasheed Williams has received dozens of misconducts, which led to his being put on the Restricted Release List (RRL) and housed in a unit with fewer privileges. Williams could only be removed from the RRL and released to general population with the approval of the Secretary of the Pennsylvania Department of Corrections, who reviewed inmates' RRL status annually. Over the years, Williams's housing changed several times, and he filed numerous grievances. Williams's dissatisfaction and longstanding belief that officials retaliate against him because of his grievances and lawsuits spawned this § 1983 suit, which Williams brought *pro se* in January of 2022 against various prison officials.

Williams's first claim concerns two officials who worked at SCI Benner, the facility at which he was incarcerated from February of 2020 through March of 2021. According to Williams, these officials retaliated against him in violation of the First Amendment by refusing to put him in a step-down program — which would help him work toward removal from the RRL and reentry into general population — because of his frequent grievances and lawsuits.

1

Williams's second claim is also for First Amendment retaliation. He alleges that because of his grievances and lawsuits, a different group of officials — this time at SCI Phoenix, where he was housed from March of 2021 until June of 2024 — first delayed his entry into a step-down program, and then changed his placement within that program so that he would spend more time there. Williams further alleges that this same group of officials violated his procedural due process rights by taking actions that prevented the Secretary from meaningfully reviewing Williams's RRL status in 2021.

Finally, Williams asserts a claim against John Wetzel, the former Secretary, alleging that his placement on the RRL resulted in his being kept in solitary confinement for over fifteen years in violation of the Eighth Amendment.

The Defendants moved for summary judgment on each claim, arguing that Williams failed to exhaust administrative remedies and that there is no genuine dispute of material fact as to the merits. The Court grants the motion, dismisses the retaliation claims without prejudice for failure to exhaust and enters judgment in the Defendants' favor on the procedural due process and Eighth Amendment claims.

I

A

Williams has been incarcerated in Pennsylvania state prison since 1997. (RRL Interim Interview, ECF No. 103-14.) The Department of Corrections (DOC) believes he is a member of the Bloods, and over the course of his incarceration, Williams has accumulated over fifty misconducts and two dozen separations. (*Id.*) He has also demonstrated a proclivity to formally pursue complaints concerning his detention: He has filed eight lawsuits against DOC officials in state and federal court and submitted

hundreds of grievances through the prison grievance system. (Pl. Dep. at 10:13–17, ECF No. 103-1; Moore Decl. Attachment A, ECF No. 114-1.)

In 2008, Williams was placed on the RRL. (Pl. Dep. 23:17–18.) RRL procedures are detailed in DC-ADM 802, the Administrative Custody Procedures policy. *See generally* (ADM 802, ECF No. 103-2).[1] An inmate can only be placed on the RRL upon the request of a Facility Manager who believes the inmate "poses a threat to the secure operation of the facility" that cannot be alleviated by a transfer. (*Id.* § 1(C)(1).) The Secretary of Corrections has final approval authority over this placement. (*Id.*; *id.* § 1(C)(4).) The Program Review Committee (PRC) regularly reviews inmates' RRL status, and inmates on the RRL also receive an "Annual RRL Review at the time of the inmate's regularly scheduled annual review." (*Id.* §§ 2(D)(1), (5), (10).) As part of the annual RRL review, various staff members and prison officials provide their recommendation as to whether the inmate's status should continue. (*Id.*) If the PRC and Facility Manager recommend removal from the RRL, their recommendations, "along with a current Psychological Evaluation," are sent to the Secretary, who has final approval authority over whether the inmate remains on the RRL. (*Id.* § 4(B)(1)–(4).) A Facility Manager can also recommend suspension of RRL status to facilitate a step-down process, subject to the approval of the Executive Deputy Secretary for Institutional Operations or Regional Deputy Secretary. (*Id.* § 4(B)(6).)

Following his placement on the RRL, Williams was housed for some time in a Security Threat Group Management Unit (STGMU). (RRL Interim Interview, ECF No. 103-14; 2021 RRL Review at 22, ECF No. 103-13.) In June of 2017, Williams

---

[1]     The Court uses the version of ADM 802 that was published in 2016 and operative during the period in which Williams's claims arose.

progressed to Phase 1 of the STGMU, (RRL Interim Interview), and was transferred to SCI Retreat, where he spent, in total, roughly nine months in general population, (Pl. Resp. Ex. 53, p.251). His last period in general population lasted less than three months in 2018. (*Id.*; RRL Interim Interview.) In April of that year, Williams was returned to the STGMU. ((RRL Interim Interview; ICAR at 10; 2021 RRL Interview at 42.) In August of 2019, he was again placed on the RRL. (2021 RRL Review at 33; ICAR at 9; RRL Interim Interview.)

B

Early in February of 2020, Williams was transferred to SCI Benner. (Pl. Dep. at 13:11–15; 2021 RRL Review at 3, ECF No. 103-13.) Williams says that upon his arrival, he had a PRC hearing at which Robert Marsh and Bradley Booher — then the facility's Superintendent and Deputy Superintendent — told him that if he accumulated no misconducts over the course of one year at SCI Benner, he would be allowed to enter a step-down program aimed at removing him from the RRL. (SAC ¶ 35; Pl. Resp. at 8.) But, Williams alleges, Marsh and Booher then pulled him aside and told him that because he frequently files grievances and lawsuits, he would never be allowed to enter a step-down program. (Pl. Resp. at 8.) According to Williams, Marsh and Booher also told other inmates that they would be eligible for a step-down program if they did not file grievances and lawsuits like Williams does. (*Id.* at 8–9.)

Williams did not accrue any misconducts in the following year. (Pl. Dep. at 40:1–17; RRL Interim Interview.) But he was not placed in a step-down program at SCI Benner. According to Marsh and Booher, someone at the PRC hearing told Williams that a year of good behavior was necessary before he would "even be considered" for a

step-down.  (Booher Decl. ¶ 6, ECF No. 103-18; Marsh Decl. ¶ 5, ECF No. 103-19).  But, they say, SCI Benner had no step-down program for RRL inmates at that time.  (Booher Decl. ¶ 6; Marsh Decl. ¶ 5.)[2]  And although they knew in February of 2021 that a new program for RRL inmates was being developed, they knew of no plans to implement that program at SCI Benner.  (Booher Decl. ¶ 7–8; Marsh Decl. ¶ 6.)  Accordingly, Booher understood that Williams would be transferred to another facility to begin that program.  (Booher Decl. ¶ 8.)[3]

## C

### 1

In late March of 2021, Williams was transferred to SCI Phoenix in order to be placed in the newly created Intensive Management Unit (IMU) program.  *See* (Inmate Cumulative Adjustment Records (ICAR) at 18, ECF No. 103-6; Booher Decl. ¶ 8; SAC ¶ 58; Pl. Dep. at 49:6–15, 86:22–23, ECF No. 103-1).  The IMU's goal "is to identify the prior thoughts and behaviors necessitating IMU placement and to provide the skills necessary to overcome them and reintegrate into a general population setting."  (SCI Phoenix IMU Inmate Handbook 2022 at 2, ECF No. 103-10); *see also* (July 8 Letter, ECF No. 103-8); (IMU Treatment Information at 1, ECF No. 103-9).

Although Williams was transferred in March, the IMU was not up and running for some time.  On July 8, 2021, John Wetzel — then the Secretary of Corrections —

---

[2]    Williams contests this statement through an unsworn declaration, ostensibly from an inmate who was at SCI Benner, who says he participated in a step-down program there.  (Alston Aff., Pl. Resp. Ex. 14, p.87); *see also* (IRAC at 21) (entry for 10/22/2020 recording that when Williams "asked if he could be considered to come out to start cleaning the showers," he was "advised that this is typically part of the RRL Step-Down process, which he has not yet been approved for.").

[3]    Marsh, who left Benner to become a Regional Deputy Secretary at the end of February 2021, stated only that he did not play a role in Williams's transfer.  (Marsh Decl. ¶¶ 1, 7.)

sent inmates a letter about the creation of the IMU.  (July 8 Letter.)  Wetzel stated that

IMU "programming and incentives" would become available on July 12.  (*Id.* at 2.)

　　　As of August, the IMU program had five tiers, each of which consisted of a series

of in- and out-of-cell exercises aimed at improving inmates' emotional management,

communication and interpersonal skills.  (IMU Treatment Information at 1–2.)

Williams received IMU enrollment documents in September, notifying him that he had

been recommended for placement in the IMU, a five-tier program, with a start date of

October 4.  (Enrollment Documents at 1, ECF No. 103-11; ICAR at 17.)  Although

Williams never filled out the form, and failed to return it by the required deadline, he

eventually submitted the paperwork with his signature and the notation "signed under

duress."  (Enrollment Documents at 1, 2; Stickney Decl. ¶¶ 8–9.)  In the meantime, he

began working on IMU assignments.  (Stickney Decl. ¶ 8.)

　　　Members of Williams's Unit Team met on November 4 to "discuss/recommend

IMU program placement" for Williams.  (IRAC at 16.)  In attendance were Unit

Manager Jamie Luquis, Psychological Services Specialist Christine Stickney, and three

other SCI Phoenix officials.  (*Id.*)  Their conversation was documented and sent to the

PRC.  (*Id.*)  On December 7, Williams was given paperwork indicating that his

"tier/phase" placement was "3/4."  (Grievance 959192 at 2, ECF No. 103-12; Stickney

Decl. ¶ 12.)  According to Stickney, uncertainty regarding the structure of the program

led the Unit Team to assign each inmate a two-number range.  (Stickney Decl. ¶ 10.)

After assigning Williams a 3/4 in November, the team learned that the IMU would

utilize a six-phase format rather than the initially planned five-tier structure.  (*Id.*

¶ 11.)  On December 8, Stickney and Luquis told Williams that he would be placed in Phase 4.  (*Id.* ¶ 12; ICAR at 16.)

Williams then filed Grievance 959192, alleging that when he told members of the Unit Team that his 3/4 placement was based on fabricated misconducts, he was "told by the unit team at SCI Phoenix" that because he filed lawsuits and continued to file grievances, he "would continue to not be put back in general population."  (Grievance 959192 at 1.)  The grievance was denied at initial review and on both appeals.  (*Id.* at 3, 5, 7.)[4]

2

On May 4, 2021, several weeks after arriving at SCI Phoenix, Williams was seen for a special psychological assessment.  (May 2021 Special Psychological Assessment, ECF No. 103-4; ICAR at 17).  And on May 25, Williams met with Jacob Smith, his Corrections Counselor, to conduct his "Annual Case Review."  (ICAR at 17.)  Smith and Williams "reviewed [Williams's] housing assignment, work assignment, misconducts and any programs required or completed."  (*Id.*)  Smith noted that Williams was assigned "RRL status and H and Z program codes," and that those codes would "be reviewed for appropriateness."  (*Id.*)

On May 30, Williams filed a grievance claiming his due process rights had been violated because the date for his "ann[ua]l [re]view for the RR[L]" had passed, yet he had not "had [his] ann[ua]l review."  (Grievance 929746 at 1, ECF No. 103-5.)  The grievance was denied based on the May 25 meeting with Smith.  (*Id.* at 2.)  DOC

---

[4]    Williams also filed Grievance 959193, in which he complained about the change in his phase level as a violation of procedural due process; this grievance was also denied at each stage.  *See* (Grievance 959193, ECF No. 27-5).

records show that Williams didn't appeal the denial.  (Moore Decl. Attachment A.)
Williams maintains that he did, yet never received a response.  (Pl. Resp. at 18.)

Wetzel acknowledged that his 2021 annual RRL reviews were delayed,
attributing the discrepancy to "the lingering effects of the Covid pandemic."  (*Id.* ¶ 10);
*see also* (July 8 Letter at 1).[5]  In early August of 2021, Wetzel decided to keep Williams
on the RRL.  (2021 RRL Review at 1, ECF No. 103-13; ICAR at 17; Wetzel Decl. ¶ 9.)
On August 4, Williams was notified of Wetzel's decision.  (ICAR at 17.)

3

Williams was ultimately approved for removal from the RRL in May of 2024.
(RRL Interim Interview; RRL Removal, ECF No. 103-15.)  In June, he was transferred
to the Management Control Unit (MCU) at SCI Greene.  (Pl. Resp. Ex. 53, p.250; ICAR
at 1.)[6]

In January of 2022, while still in the IMU at SCI Phoenix, Williams filed this
suit.  (Compl., ECF No. 1.)  In his Second Amended Complaint, he alleges that Marsh
and Booher retaliated against him in violation of the First Amendment by not placing
him in a step-down program at SCI Benner.  (SAC ¶ 37 & p.15, ECF No. 64.)  He also

---

[5]    The Secretary can suspend ADM 802 "[i]n emergency or extended disruption of normal
facility operation," (ADM 802 at 2), but the record contains no evidence that Wetzel suspended the
requirement for annual RRL reviews due to Covid.

[6]    According to an exhibit Williams submitted — which appears to be part of an IMU manual —
to reach IMU Phase 1, an inmate must be removed from the RRL.  (Pl. Resp. Ex. 70, p.319.)  Phase 1
inmates are transferred to another facility and placed "a general population step-down unit."  (*Id.*)
They "must remain in the MCU or general population for a period of one year," after which the IMU
Unit Team votes to recommend Phase 1 completion.  (*Id.*)
    According to the most recent version of the DOC's publicly available Administrative Custody
Procedures, the MCU is "a modified general population setting."  *See* Commonwealth of
Pennsylvania Department of Corrections, *Administrative Custody Procedures*, DC-ADM 802
§ 2(D)(12) (Nov. 4, 2024), available at https://www.pa.gov/content/dam/copapwp-
pagov/en/cor/documents/about-us/doc-policies/802-administrative-custody-procedures.pdf.

alleges that Stickney, Luquis, Thomas Grenevich, Joe Terra and Jaime Sorber[7] (the Phoenix Defendants) engaged in First Amendment retaliation by (1) delaying his placement on the IMU and (2) placing him in a lower phase than initially planned. (*Id.* ¶¶ 58–59, 80–87.) Williams further claims the Phoenix Defendants violated his procedural due process rights by failing to submit a recent psychological evaluation to Wetzel, preventing a meaningful review of his RRL status in 2021, and that the review was based in part on false information. (*Id.* ¶¶ 39–50, 68–77.) Finally, Williams alleges that Wetzel violated his Eighth Amendment rights by keeping him on the RRL and so in solitary confinement for well over a decade. (*Id.* ¶¶ 88–97.)

## II

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, they have the burden of demonstrating that

---

[7]    Grenevich was a Unit Manager at SCI Phoenix, (Grenevich Resp. to Req. for Admissions, Pl. Resp. Ex. 20, p.164); Terra was a Deputy, and is now Superintendent, at that facility, (Answer ¶ 13, ECF No. 83; ICAR at 15); and Sorber was Superintendent at the time, (Answer ¶ 7).

the plaintiff "has failed to establish one or more essential elements of [his] case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (cleaned up) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to "weigh the evidence and determine the truth of the matter," but rather to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In doing so, the court must construe the facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587. But "conjecture and speculation" cannot create a genuine issue of material fact. *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 328 (3d Cir. 2016). And the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III

### A

#### 1

The Prison Litigation Reform Act requires inmates who bring § 1983 suits "with respect to prison conditions" to first exhaust all "such administrative remedies as are available[.]" 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege

excessive force or some other wrong.").  Exhaustion is an affirmative defense that the defendant "must plead and prove."  *Paladino v. Newsome*, 885 F.3d 203, 207 (3d Cir. 2018) (quotation omitted).  If a defendant shows that administrative remedies were not exhausted, the plaintiff bears the burden of demonstrating that such remedies were, in effect, unavailable.  *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018).  Because exhaustion is "a preliminary issue for which no right to a jury trial exists," the district court may resolve exhaustion-related factual disputes so long as the parties were given notice and sufficient opportunity to be heard.  *Paladino*, 885 F.3d at 210–11 (quotation omitted).[8]

## 2

Prison grievance procedures "define the boundaries of proper exhaustion."  *Jones v. Bock*, 549 U.S. 199, 218 (2007).  So proper exhaustion requires prisoners to "complete the administrative review process in accordance with the applicable procedural rules."  *Id.*  The Third Circuit has held that completing the administrative review process "means 'substantial' compliance with the prison's grievance procedures."  *Small v. Camden Cnty.,* 728 F.3d 265, 272 (3d Cir. 2013) (citation omitted).  And in some circumstances, the prison can waive an otherwise meritorious exhaustion defense.  *Rinaldi*, 904 F.3d at 270–72.  For instance, where an inmate fails to comply with a procedural requirement to name an official involved in the relevant event, "[t]he prison can excuse an inmate's failure . . . by identifying the unidentified persons and acknowledging that they were fairly within the compass of the prisoner's grievance."

---

[8]    The Supreme Court's recent decision limiting the circumstances in which courts may act as the factfinder is inapplicable here. *Perttu v. Richards*, 145 S. Ct. 1793, 1800 (2025) (holding "that parties have a right to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim that falls under the Seventh Amendment").

*Spruill v. Gillis*, 372 F.3d 218, 234 (3d Cir. 2004).  But "[w]hatever the parameters of 'substantial compliance' it does not encompass . . . the filing of a suit before administrative exhaustion, however late, has been completed."  *Ahmed v. Dragovich*, 297 F.3d 201, 209 (3d Cir. 2002).

Exhaustion is only required where administrative processes are "available."  *See* 42 U.S.C. § 1997e(a).  And failure to comply with established administrative procedures is excused where the procedure was, effectively, not available to the inmate.  *Ross v. Blake*, 578 U.S. 632, 642 (2016).  An administrative procedure is unavailable in various circumstances, including where (1) the procedure "operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates," (2) the procedure is "so opaque that it becomes, practically speaking, incapable of use," or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 643–44.  Administrative remedies will also be deemed unavailable "as soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies."  *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019).

B

The PLRA's exhaustion requirement applies to grievance procedures described in an inmate handbook, regardless of whether that procedure was formally adopted by a state agency.  *Concepcion v. Morton*, 306 F.3d 1347, 1348–49 (3d Cir. 2002).  In Pennsylvania, the general grievance process applicable in facilities operated by the DOC is found in policy DC-ADM 804.  (ECF No. 103-21.)

12

ADM 804 establishes a three-tiered system for inmate grievances. The formal grievance process begins when the inmate submits a designated carbon-copy form to the Facility Grievance Coordinator. (ADM 804 § 1(A)(5).) The inmate keeps one of the four copies of the form, and the other three are deposited in a designated lock-box. (*Id.* §§ 1(A)(5), 1(B)(1)–(2).)

ADM 804 imposes a number of requirements on grievance submissions. For example, the grievance must (1) be filed within fifteen working days[9] of the underlying event; (2) include a statement of relevant facts identifying the date of the event and persons involved; and (3) concern only a single event. (*Id.* §§ 1(A)(8), 1(A)(11), 1(A)(14).)

After retrieving a grievance form from a lock-box, the Facility Grievance Coordinator assigns it a tracking number and enters it into the Automated Inmate Grievance Tracking System (AIGTS).[10] (*Id.* § 1(C)(1).) If the grievance complies with the procedures manual, the Facility Grievance Coordinator returns a copy of the form to the inmate, acknowledging its receipt. (*Id.* § 1(C)(3).) The staff member designated to respond to the grievance has fifteen working days from the date the grievance is entered into AIGTS to return a response to the inmate. (*Id.* § 1(C)(5)(g).)

Once an inmate receives this initial review response, he has fifteen working days to appeal the response to the Facility Manager, again by placing the necessary papers in a designated lock-box. (*Id.* § 2(A)(1).) After receiving the appeal, the Facility

---

[9]    "[W]orking days are Monday through Friday, excluding state holidays." (ADM 804, Glossary.)

[10]    AIGTS is an electronic database used by the Department of Corrections to track inmate grievances. (Moore Decl. ¶ 4.) Facility Grievance Coordinators, officers investigating grievances, Facility Managers, and staff from the Secretary's Office of Inmate Grievances & Appeals (SOIGA) can enter information into AIGTS in accordance with their roles in reviewing grievances, and other staff members can view that information. (*Id.* ¶¶ 6–7, 10, 11–13, 15.) But once a grievance is entered into AIGTS, it can be deleted only by two members of SOIGA. (*Id.* ¶ 16.)

Manager has fifteen working days to provide the inmate with a response. (*Id.* § 2(A)(2).) The inmate then has fifteen working days to appeal the Facility Manager's response to the Chief Grievance Officer, who must respond to the appeal within thirty working days of receipt. (*Id.* §§ 2(B)(1)(b), 2(B)(2)(a)(1).) At all three stages of the process, the inmate can request an extension of the filing deadline and prison officials can extend their response deadline by ten working days, provided the inmate is notified of this extension. (*Id.* §§ 1(C)(2), 1(C)(6)(e), 2(A)(2)(c), 2(A)(2)(d)(4), 2(B)(1)(c), 2(B)(2)(a)(3).)

Jacqueline Burd, the Facility Grievance Coordinator at SCI Benner, explained that she retrieves grievances from the prison's lock-boxes every morning except holidays and weekends, when she retrieves them the following workday. (Burd Decl. ¶¶ 2, 5.) She timestamps each grievance, enters into it AITGS and determines whether to reject or accept the grievance for investigation. (*Id.* ¶¶ 6–9.) Gina Orlando, one of the two Facility Grievance Coordinators at SCI Phoenix, described the similar process at that facility. (Orlando Decl. ¶¶ 2, 4–7.)

## IV

### A

Williams alleges that Booher and Marsh refused to place him on a step-down program at SCI Benner because he had filed lawsuits and grievances. (SAC ¶¶ 35–37; Pl. Resp. at 8–10.)

Booher and Marsh have satisfied their burden of showing that Williams did not exhaust this claim: According to DOC records, in his fourteen months at SCI Benner,

Williams filed fourteen grievances, none of which concerned his current claim. (Moore Decl. ¶¶ 17–20 & Ex. 1; Berg Decl. ¶ 9–11; ICAR at 18, 25.)

Williams, however, argues that the grievance process was "rendered unavailable" to him when "prison officials thwart[ed] [his] ability to utilize it." (Pl. Supp. Resp. at 13 (citing *Ross*).) Williams maintains that he filed three grievances against Booher and Marsh, but never received a response to any of them. (Pl. Resp. at 6–7; Booher/Marsh Grievances, Pl. Resp. Exs. 2–4, pp. 64–73.) To support this assertion, Williams submitted four affidavits[11] — ostensibly from inmates with whom he was incarcerated at SCI Benner — claiming that they saw him place the latter two grievances in a designated lock-box on the precise day the grievance is dated. (Pl. Supp. Resp at 3, 11; Booher/Marsh Grievance Affs., Pl. Supp. Resp. Exs. B–E, pp.71–77.)

Despite these affidavits, Williams has failed to show that the prison's grievance procedure was unavailable to him for purposes of *this specific claim*. ADM 804 requires inmates to grieve "separate events . . . separately" and "within [fifteen] working days of the event upon which the claim is based." (ADM 804 §§ 1(A)(8), (14).) Williams's purported grievances are dated July 30, October 5, and December 19, 2020 and concern supposed threats by Booher and Marsh. (Booher/Marsh Grievances, Pl. Resp. Exs. 2–4, pp. 64, 68, 71.) They do not — indeed, could not — concern the event for which Williams is now bringing suit: actually carrying out those threats by denying him entry into an available program for which he was eligible. Williams cannot rely on the

---

[11]    Technically, the documents are unsworn declarations or statements under 28 U.S.C. § 1746.

purported unavailability of a process that he never tried to use to grieve this issue.[12] And because he did not utilize this available process, Williams's claim against Booher and Marsh is dismissed without prejudice for failure to exhaust.

### B

Williams brings two sets of claims against Sorber, Grenevich, Stickney, Luquis and Terra (the Phoenix Defendants). In the first, he alleges that they violated his First Amendment rights when, due to his frequent filing of lawsuits and grievances, they (a) delayed his placement in the IMU, (SAC ¶¶ 58–59; Pl. Resp. at 12–13), and (b) changed his phase/tier level within the program, (SAC ¶¶ 80–87). The Phoenix Defendants argue that Williams failed to properly exhaust because (1) he filed this lawsuit before completing the appeal process for Grievance 959192, (2) grieved only the change to his phase level, not any delay in his IMU placement, and (3) did not name Sorber, Grenevich or Terra in that grievance. (Def. Mot. at 10–11.)

Although Williams appealed Grievance 959192 through each stage laid out in ADM 804, he failed to comply with the PLRA's requirement that exhaustion occur

---

[12]    Williams does not argue that the failure to process these three earlier grievances shows that a later grievance would have also been ignored. Even if he had, that argument would fail. DOC records show that Williams filed fourteen grievances while at Benner, five of which arose after the first ostensibly ignored grievance in July of 2020. *See* (Moore Decl. Attachment A). When an inmate claims the grievance process was not available because he was intimidated into not using it, the fact that he was able to file grievances on other topics is not dispositive of whether the process was unavailable for purposes of the claim at issue. *Rinaldi*, 904 F.3d at 269–70. But the Court sees no reason to extend this principle to a context in which the prisoner believes a grievance would be fruitless but offers no evidence of a systemic breakdown. *Cf. Bakhtiari v. Spaulding*, 779 F. App'x 129, 133 (3d Cir. 2019) (finding an inmate's ability to "submit some administrative remedy forms . . . undermines his argument" that remedies were unavailable despite his unsworn declarations saying forms were "lost, shredded, or never delivered"); *Ross*, 578 U.S. at 643 (noting a process is an unavailable dead-end where officers are "unable or *consistently unwilling* to provide *any* relief") (emphasis added); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000) (holding that even when an administrative proceeding cannot provide the remedy requested in the federal suit, there is no "futility exception" to exhaustion).

before suit is "brought."  42 U.S.C. § 1997e(a).  The Third Circuit has not issued a

precedential decision addressing what it means for a prisoner to "bring" a suit under

this section of the PLRA.  But in *Brown v. Sage*, the circuit interpreted the meaning of

"brought an action" in 28 U.S.C § 1915(g), the provision of the PLRA that limits suits by

three-strikers.  941 F.3d 655, 661 (3d Cir. 2019) (en banc).  The court held that "a

prisoner has 'brought an action' for purposes of the PLRA as soon as he tenders or

submits a complaint to the district court," *id.* at 661–62, an interpretation that accords

with the Seventh and Ninth Circuits' interpretation of "brought" in 42 U.S.C § 1997e(a),

*id.* at 662–63 (citing *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006) and

*Ford v. Johnson*, 362 F.3d 395, 399–400 (7th Cir. 2004)); *cf. Law v. Siegel*, 571 U.S. 415,

422 (2014) (applying "the 'normal rule of statutory construction' that words repeated in

different parts of the same statute generally have the same meaning") (citation

omitted); *Washington v. Gilmore*, 852 F. App'x 639, 641–42 (3d Cir. 2021) (applying

*Brown* to § 1997e(a)).

Here, Grievance 959192 was received on December 15.  (Grievance 959192 at 1.)

The initial response is dated December 27.  (*Id.* at 3.)  And Williams's first appeal is

dated January 7, 2022.  (*Id.* at 4.)  Even assuming the appeal was received the very

same day, the Facility Manager's response was not due until January 31.  *See* (ADM

804 § 2(A)(2)(d)(1)).

Yet Williams's initial complaint was dated January 2, 2022 and filed by the

clerk's office on January 14.  (Compl. at pp. 23–24, ECF No. 1; Docket, *Williams v.*

*Stickney*, 2:22-cv-214 (E.D. Pa.).)  By bringing this action before either (1) he proceeded

through each stage of ADM 804 or (2) the response time allotted by the policy expired

such that exhaustion could be excused under *Shifflett*, Williams failed to comply with
the requirement that he exhaust administrative remedies before bringing suit.[13]

The fact that Williams's operative complaint was filed after he received the final
appeal response in April of 2022, *see* (Pl. Resp. at 11), does not change things.
Generally, an amended complaint "supersedes the original pleading and renders the
original pleading a nullity." *Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019).
And in *Garrett*, the Third Circuit permitted a plaintiff to proceed on an amended and
supplemental complaint filed under Rules 15(a) and (d) despite his failure to exhaust
administrative remedies prior to filing his initial complaint. *Id.* at 81–91. But the
circuit court repeatedly emphasized Garrett's non-prisoner status at the time of the
amended filing: since Garrett was no longer a prisoner, he was no longer subject to the
PLRA's requirements, and his change in status cured the defect in his initial complaint.
*See, e.g.*, *id.* at 84; *id.* at 87–88 (noting that ordinary procedural rules apply unless the
PLRA specifies otherwise and finding Garrett's non-prisoner status determinative).
Because Williams was still a prisoner at the time the operative complaint was filed, he
remained subject to the PLRA's requirements. *See id.* at 82 ("It has long been the rule
then that where a party's status determines a statute's applicability, it is his status at

---

[13]    It's unclear when Williams received the response to his first appeal. Although a timestamp
on the response is dated January 31, the designated "Date" line is blank, and Williams says he
received the response on February 14. (Grievance 959192 at 5, 6.) February 14 would fall within the
ten-day extension period, but the inmate must be given notice of the extension, *see* (ADM 804
§ 2(A)(2)(d)(4)), and the record contains no such notice. Similarly, Grievance 959193 (also
complaining about the phase/tier level, albeit on due process grounds) was received, answered, and
appealed on the same days as Grievance 959192, but the appeal response date appears to have been,
at the earliest, February 2, 2022, *see* (Grievance 959193 at 1, 3, 5) — which, even assuming the
appeal wasn't received until the working day after it was dated, is outside the fifteen-day window.
        Regardless, even if Williams, as of February 1, would have been excused from pursuing a
second-step appeal, the fact that he brought suit before the Facility Manager's response deadline for
either grievance had passed requires dismissal for failure to exhaust.

the time of the amendment . . . that determines whether a statutory precondition to suit has been satisfied."). Accordingly, Williams failed to properly exhaust administrative remedies before bringing this suit, and his retaliation claim against the Phoenix Defendants must be dismissed. *Cf. Washington v. Gilmore*, 852 F. App'x 639, 641–42 (3d Cir. 2021) (applying *Ahmed* and scrutinizing the dates of an initial, not amended, complaint).[14]

## C

Williams's second claim against the Phoenix Defendants is for violation of his procedural due process rights. He alleges that (1) because the Phoenix Defendants did not submit a psychological evaluation to Wetzel before he conducted his annual RRL review in 2021, they inhibited a meaningful review of his RRL status, and (2) the review was based in part on false information they placed in his file. (SAC ¶¶ 39–50, 68–77; Pl. Resp. at 14–18.)

---

[14]    Because Williams failed to exhaust prior to bringing suit, the Court will only briefly address Defendants' remaining arguments. As to the subject of the claim, Grievance 959192 concerned only Williams's phase level, so he cannot show that he exhausted his present claim for retaliation in the form of delayed entry into the IMU. Indeed, on appeal, Williams said that he was "not being afforded the time of my arrival to this program in March of 2021." (Grievance 959192 at 6); *see also* (Grievance 959193 at 1). Williams cannot implicitly deny an issue during the grievance process and then argue during litigation that he exhausted that same claim.

As for not naming Sorber, Grenevich, or Terra, Williams's failure constituted procedural default. *See* (ADM 804 § 1(A)(11)(b)) (requiring inmates to "identify individuals directly involved in the event(s)"). However, the initial response stated that the "Unit Team and PRC" were responsible for Williams's phase placement. (Grievance 959192 at 3.) That may, under *Spruill*, have excused Williams's default against Terra and Grenevich. *See* (ICAR at 16) (entry for November 3, 2021, indicating Terra was a PRC member around the time of the phase placement); (Grenevich Resp. to Req. for Admissions, Pl. Resp. Ex. 20, pp.164–65) (stating he left the unit team in December). But Sorber's only apparent connection to the grievance is his denial of the first appeal. *See* (Grievance 959192 at 5). This is not a basis for finding that the prison acknowledged Sorber as within the grievance's scope, so default of the claim against him was not excused.

The parties briefed, initially and again at the Court's direction, issues related to the exhaustion of Grievance 929746. But Grievance 929746 is ultimately irrelevant to exhaustion of this claim.

ADM 804 expressly precludes certain issues from the grievance process, including "the reasons for placement in administrative custody." (ADM 804 § 1(A)(7).) And ADM 802, on Administrative Custody Procedures, requires that "[a]ll issues concerning the reason for an inmate's placement in AC custody or the duration of his/her AC custody" be "addressed through the procedures set forth in [ADM 802]," rather than those established in ADM 804. (ADM 802 § 2(D)(11).)

Williams's procedural due process claim concerns his maintenance on RRL status in 2021. He alleges the Phoenix Defendants deprived him of meaningful process when they caused incomplete or erroneous information to be presented to Wetzel, whose decision as to Williams's RRL status was then based on that faulty information. Williams contends that absent the Phoenix Defendants' conduct, he would have been removed from the RRL. That is a claim he could not have brought under ADM 804.[15]

Again, Defendants must plead and prove the failure to exhaust. *Paladino*, 885 F.3d at 207. But here, they offer evidence concerning only the use of grievance

---

[15]    ADM 802 does not expressly say that a challenge to RRL status must be brought via the ADM 802 appeal process, rather than the grievance procedure in ADM 804. And granted, an administrative process "need not be sufficiently 'plain' as to preclude any reasonable mistake or debate with respect to their meaning." *Ross*, 578 U.S. at 644 (citation omitted). So "[w]hen an administrative process is susceptible of multiple reasonable interpretations, . . . the inmate should err on the side of exhaustion." *Id.*

But here, administrative custody and RRL are intertwined in DOC policy and practice, and Williams's AC status was based on his RRL status. *See, e.g.*, (IRAC at 19) ("Continue AC status due to RRL status"). The Court thus interprets the prohibition in ADM 804 on grieving "the reasons for placement in administrative custody" and ADM 802's coverage of "[a]ll issues concerning the reason for an inmate's placement in AC custody or the duration of his/her AC custody" to mean that Williams could not have challenged his placement on RRL — as an initial or continued matter — outside the procedures established in ADM 802 § 2.

procedures under ADM 804.  Although there is no evidence in the record that Williams used the process under ADM 802, the Defendants' failure to prove that failure means they have not shown that Williams failed to utilize a grievance procedure that was available to him under the PLRA.  So the Court is unable to conclude that Williams failed to exhaust his procedural due process claim.

### D

Williams's Eighth Amendment claim against Wetzel is predicated on the theory that Williams was on the RRL and thus effectively in solitary confinement since 2008. (SAC ¶¶ 94–96.)  The Defendants argue that Williams did not exhaust this claim by using the procedures in ADM 804.  (Def. Mot. at 11.)  Williams failed to respond to this argument.  But again, given the subject-matter limitations on grievances filed under ADM 804, Williams could not have grieved this issue, and the record is devoid of evidence concerning Williams's use, or non-use, of the process under ADM 802.  So Williams's claim against Wetzel will not be dismissed for failure to exhaust.

\*      \*      \*

Because Williams failed to exhaust his retaliation claims, the Court need only address on the merits the due process and Eighth Amendment claims.

### V

### A

The Court turns first to the procedural due process claim.  Prisoners have a liberty interest in freedom from restraints that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000) (quoting *Sandin v. Conner*, 515 U.S. 472, 484

(1995)).  Whether this standard is met depends upon two features of the inmate's confinement: conditions and duration.  *See id.* at 144.

If the prisoner shows that a protected liberty interest was at stake, he must then show that he did not receive the process he was due.  *Id.* at 143.  When administrative custody rises to the level of a due process interest, the prisoner must receive notice and an opportunity to be heard, but he is not entitled to a formal, adversarial proceeding.  *Id.* (citing *Hewitt*).  This protection applies to the initial decision to place an inmate in administrative custody and also requires "meaningful," rather than "perfunctory" or "rote," periodic review of that placement.  *See Sourbeer v. Robinson*, 791 F.2d 1094, 1101 & 1104 n.8 (3d Cir. 1986).

## B

The Court assumes Williams has shown that his maintenance on the RRL implicated a constitutionally protected liberty interest.[16]  As such, Williams was entitled to meaningful periodic review of his RRL status, which he argues he did not

---

[16]    The actual answer to this threshold question is unclear.  Williams's claim concerns the review of his RRL status.  Yet the Third Circuit has never held that RRL status implicates constitutional rights.  *See Bowen v. Ryan*, 248 F. App'x 302, 304 (3d Cir. 2007) (affirming dismissal of inmate's claim that his placement on the RRL was without due process because "[p]lacement on this List did not deprive Bowen of his liberty, privileges, or any other constitutionally protected liberty interest").  *Compare Blount v. Mason*, No. 23-2835, 2024 WL 1045226, at *3 (3d Cir. 2024) ("[RRL] placement does not implicate a constitutionally protected due process right.") and *Huertas v. Sec'y Pa. Dep't of Corrections*, 533 F. App'x 64, 67 n.6 (3d Cir. 2013) (same) with *Bracey v. Sec'y Pa. Dep't of Corrections*, 686 F. App'x 130, 135–36 (3d Cir. 2017) ("Bracey's placement on the RRL . . . is not a housing placement but it presents a similar procedural due process issue.").

But, assuming that Williams's RRL status implicated due process (at least insofar as it was intertwined with his administrative custody status), it's unclear whether Williams was subject to an "atypical and significant hardship" in light of the duration and conditions of his confinement.  At the motion to dismiss stage, the Court was required to take Williams's allegations as true.  It accordingly held that his allegations about being on the RRL and so in solitary confinement since 2008 implicated the guarantees of the Due Process Clause.  *See* (Mem. Op. at 4, 8, ECF No. 61).  Yet Defendants now — instead of addressing whether the facts at summary judgment show that Williams had a due process interest — ignore this threshold inquiry entirely.

receive in 2021 because the Phoenix Defendants (1) failed to provide Wetzel a current psychological evaluation, thereby preventing him from conducting a meaningful review and, in turn, causing him to continue Williams's RRL status, and (2) placed false information in his file.  (SAC ¶¶ 39, 47–50, 52.)  Williams brings this claim against the Phoenix Defendants alone — not against Wetzel or any other prison official.  *See* (SAC ¶¶ 47, 50; Pl. Resp. at 2–3).[17]  So the relevant inquiry is not necessarily whether Williams received a meaningful review of his RRL status in 2021, but whether the Phoenix Defendants engaged in conduct that prevented one.  In other words, even if the 2021 review was not meaningful, no individual Phoenix Defendant can be held liable absent evidence that he or she personally participated in a constitutional violation.  *See Jutrowski v. Township of Riverdale*, 904 F.3d 280, 289–92 (3d Cir. 2018).

This requirement is fatal to Williams's claim that "the defendants put falsified documentation" in his file by stating that he had failed STGMU three times.  (SAC ¶ 39.)[18]  Williams presents no evidence that any of the Phoenix Defendants were responsible for placing this information in his file or made any statement to that effect that caused Wetzel's 2021 review of his RRL status to be merely rote.  Only one of the fifty-five pages in that review was created after Williams's transfer to SCI Phoenix.  *See* (2021 RRL Review).  That page, entitled "RRL Update" and signed by Sorber in May of 2021, summarizes information from Williams's records and contains Sorber's handwritten comments that Williams recently arrived at SCI Phoenix, is a "candidate

---

[17]    Williams included Wetzel in the heading of his response brief's section on the merits of his due process claim.  (Pl. Resp. at 14.)  That heading does not override Williams's earlier plain statement characterizing his claims.  (*Id.* at 2–3.)

[18]    DOC has acknowledged this statement is incorrect.  (Request Slip, Pl. Resp. Ex. 58, p.264.)

for step down," and should "continue RRL pending further review." (*Id.* at 2.)  Williams

presents no evidence that the mention of "multiple" STGMU failures on the page Sorber

signed rendered Wetzel's review perfunctory or rote in light of the accompanying fifty

pages, which included a psychological evaluation and detailed Williams's crime,

misconduct history and separations while in DOC custody.[19]

Williams's remaining due process argument — that the Phoenix Defendants

violated ADM 802, and therefore his procedural due process rights, by failing to send

Wetzel a recent psychological evaluation, (SAC ¶¶ 47–50, 52) — also fails.  ADM 802

requires the Secretary be sent a "current psychological evaluation" when a Facility

Manager (1) initially requests that an inmate be placed on the RRL and (2)

recommends removing the inmate from RRL.  (ADM 802 §§ 1(C)(3), 4(B)(3).)  But the

policy is silent on the use of psychological evaluations for the annual RRL review.  *See*

---

[19]     Williams now argues that unspecified "PRC reviews" mentioned various misconducts over
which he sued DOC officials, who settled the claims out of court. (Pl. Resp. at 18.)  There are no facts
in the record establishing whether those settlements involved an agreement as to Williams's non-
responsibility for those misconducts.  Nor does he present evidence showing that any of the Phoenix
Defendants were responsible for placing this information in his file or that it rendered his 2021 RRL
review meaningless.

The nature of Williams's complaint is similarly fatal to another issue he raised for the first
time at summary judgment.  Williams alleged that in May of 2021 he did not receive an annual
review pursuant to ADM 802.  (SAC ¶¶ 40–41.)  He did not attribute that failure to any particular
defendant.  But the gravamen of his complaint is that because materials that must be sent to Wetzel
were not sent prior to his August 2021 decision, that decision was based on incomplete information.
*See* (*id.* ¶¶ 47–50, 52).  Williams now argues that the 2021 review was actually a combined review
for both 2020 and 2021, in violation of the "annual" review requirement in ADM 802.  (Pl. Resp. at
16–17.)  The record supports that argument: Wetzel's 2021 review was based on documents created
in 2020, but his 2022 review was begun and completed that same year.  *Compare* (2021 RRL Review
at 1) *with* (2022 RRL Review, Pl. Resp. Ex. 57, p.262); *see also* (July 8 Letter at 1) ("Although this
delay was due to the COVID-19 pandemic, the final responses are based on your current progress
and an updated referral from each facility."); (Wetzel Dep., Wayne v. Wetzel, No. 21-4209 (E.D. Pa.)
64:4–71:18, ECF No. 103-20) (explaining that annual RRL reviews were paused between spring of
2020 and summer of 2021 and he reviewed whatever was in the review packet sent to him).  Other
courts in this circuit have rejected the argument that this Covid-induced delay violated due process.
*Wayne v. Wetzel*, No. 21-4209, 2024 WL 3696467, at *9–10 (E.D. Pa. Aug. 7, 2024); *Hall v. Zaken*, No.
20-1431, 2022 WL 17979664, at *9 (W.D. Pa. Dec. 6, 2022).  Regardless, Williams did not bring a due
process claim against Wetzel for this action, and does not argue that the Phoenix Defendants are
responsible it.

(*id.* § 2(D)(10)). Williams's argument is thus premised on a misreading of ADM 802. And he offers no independent reason why due process requires *the Phoenix Defendants* to send Wetzel, who had final authority over his placement, a current psychological evaluation.[20] Judgment on this claim is entered in favor of the Phoenix Defendants.

VI

A

Williams's Eighth Amendment claim also fails on the merits. To prove an Eighth Amendment conditions-of-confinement claim, a plaintiff must show that (1) he endured a "sufficiently serious" deprivation and (2) the prison official had "a sufficiently culpable state of mind." *Clark v. Coupe*, 55 F.4th 167, 179 (3d Cir. 2022) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The first element requires a showing that the inmate was "denied 'the minimal civilized measure of life's necessities.'" *Id.* (quotation omitted). "[T]he Constitution does not mandate comfortable prisons," and conditions that are "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). So it is not enough that a prisoner was "merely uncomfortable." *Clark*, 55 F.4th at 179. Rather, he must show that he was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* (quoting *Farmer*, 511 U.S. at 834).

---

[20]    Williams's theory that Wetzel must not have looked at his May 2021 psychological evaluation is premised on Smith's access to that report during the summer of 2021. (Pl. Resp. at 15–16.) The actual evidence in the record concerning Wetzel's use of a psychological evaluation comes from (1) the 2021 RRL review itself, which includes a psychological evaluation from April of 2020, (2021 RRL Review at 38–45), and (2) Wetzel's testimony as to his habit of reviewing, and if necessary requesting, a recent evaluation in order to conduct RRL annual reviews, (Wetzel Decl. ¶¶ 5–9). Assuming both that Wetzel considered the 2020 evaluation sufficiently recent to forego requesting a 2021 evaluation and that such a decision rendered his review rote or perfunctory, a claim based on that decision had to be directed at Wetzel, not at the Phoenix Defendants.

25

The second element requires a showing that the official "acted with deliberate indifference," meaning he "knew [], but disregarded, that the prison conditions posed 'an excessive risk to inmate health and safety.'" *Id.* (quotation omitted).  The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Thomas v. Tice*, 948 F.3d 133, 142 (3d Cir. 2020) (quoting *Farmer*, 511 U.S. at 837).  In evaluating this element, the Court "may also consider whether officials 'had a legitimate penological purpose' behind their conduct." *Porter v. Pa. Dep't of Corrs.*, 974 F.3d 431, 446 (3d Cir. 2020) (quotation omitted).

B

Williams alleges that he has been in solitary confinement since 2008[21] and that Wetzel knew long-term solitary confinement posed a substantial risk to inmates' mental health.  (SAC ¶¶ 88–97.)  But the record does not contain evidence from which a reasonable jury could infer that Williams faced a substantial risk of serious harm.[22]

---

[21]    Williams claims that under prison policy, being on the RRL necessarily resulted in continued placement in solitary confinement, so he has thus been in solitary since 2008.  (SAC ¶¶ 94–95; Pl. Resp. at 20–21.)  Wetzel disputes Williams's view of his RRL status over time.  (Def. Mot. at 19–20.) There is, however, a more fundamental problem with Williams's claim: the record shows that an inmate on the RRL can be held in a variety of housing units, and the only housing condition that RRL status itself determines is that the inmate is not (as a general rule) housed in general population.  *See* (ADM 802 § 4(b)(1), (6)) (providing RRL inmates may not be removed from Security Level 5 housing without the Secretary's approval and permitting suspension of RRL status for step-down purposes).

Nonetheless, the essence of Williams's claim is that he was kept in solitary confinement since 2008, so the relevant inquiry is not the duration of his RRL status but the nature of his confinement.

[22]    Williams emphasizes the duration of his alleged solitary confinement but also listed, in his complaint, specific conditions he allegedly endured.  (SAC ¶ 88.)  Most, he already resolved with the DOC.  (*Id.* ¶¶ 88(A)–(B), (D), (E).)  Two others have no inherent connection to solitary confinement, (*id.* ¶¶ 88(C), (E) (food trays with razors, scalpels and dead mice, and being placed in a hard cell)), and Williams does not mention them again now.  Regardless, there is no evidence in the record that Wetzel was deliberately indifferent to these conditions in violation of the Eighth Amendment.  *See Thomas*, 948 F.3d at 139, 141–42 (affirming dismissal of claim against PRC members where the

To begin, neither party points to evidence concerning the conditions of Williams's confinement between 2008 and 2017. Williams was in a Restricted Housing Unit (RHU) during most of that period, and in the STGMU program from 2013 to 2017. *See* (Pl. Resp. Ex 53, pp.251–55; ICAR at 10). The Court's independent review of the record revealed little evidence of general RHU or STGMU conditions prior to November of 2016, and no evidence of Williams's specific conditions.[23]

Nor does either party point to record evidence concerning the conditions of Williams's confinement between his return to STGMU in April of 2018 and his placement in the IMU at SCI Phoenix.[24] The record shows that Williams was in RHUs, initially as part of a STGMU program, for nearly two years before his arrival at SCI Benner. *See* (Pl. Resp. Ex. 53 at 250–51; 2021 RRL Review at 31–34). But again, there is no record evidence of Williams's specific conditions (1) while he was in the STGMU or (2) after he was removed from STGMU but prior to his transfer to SCI Benner.[25] The

---

record did not show that any member knew of the prisoner's conditions). The remaining condition he lists, (SAC ¶ 88(G) ("deprived of all meaningful human contact")), is part of the analysis below.

[23]    Assuming the RHU is "a regular Security Level 5 [] Housing Unit," the only evidence in the record concerning general RHU conditions in this timeframe comes from the November 2016 version of ADM 802. *See generally* (ADM 802 § 3). Inmates in regular Level 5 Housing are permitted non-contact visits, one hour of exercise for five days a week, and, initially, no radio, tablet, kiosk, television, or telephone access. (ADM 802 § 3(A)(2)–(7).) These initial restrictions are loosened and further privileges can be granted over time. (*Id.* § 3(A)(9), (10)). Inmates in AC status should also "be provided access to programs and services that include" education, commissary, the library, casework and counseling, religious guidance, and "recreational programs." (*Id.* § 3(B).) Inmates in "Special Housing Units," however, are subject to the rules outlined in the unit handbook. (*Id.* § 3(A)(1).) And as for STGMU conditions, the only evidence comes from a single undated page of a STGMU manual indicating that inmates outside of Phase 5 receive out-of-cell group treatment. (Pl. Resp. Ex. 63, p.296).

[24]    Williams was housed in general population for roughly nine months between June of 2017 and April of 2018. (Pl. Resp. Ex. 53 at 251; RRL Interim Interview.)

[25]    The record shows that Williams was in STGMU Phases 5 through 3 for some of this period, (2021 RRL Review at 42), but not how long he was in each or the conditions of each phase.

record contains marginally more evidence of Williams's conditions of confinement at SCI Benner: his ICAR records show that he requested and received progressively greater privileges in terms of weekly phone calls and kiosk uses as well as possession of a tablet and TV. (2021 RRL Review at 28–30; ICAR at 19–21). But for the most part, there is no detail as to Williams's specific conditions — particularly his amount of out-of-cell time and visiting permissions.[26]

Defendants do point to record evidence concerning inmates' conditions in the IMU at SCI Phoenix. In Phase 6 — the most restrictive — an inmate receives two hours of exercise per day, seven days a week; one phone and one video visit per week; three showers per week; and, if permitted by the PRC, a TV, radio, tablet, or kiosk access. (2022 IMU Handbook at 13.) By Phase 4 — the phase at which Williams started — inmates' privileges increase. They may congregate with up to two other inmates when exercising, have three phone calls and tablet/kiosk connections per week as well as five video visits per month, take four showers per week, possess a TV or radio, and eat two meals per week out-of-cell with up to two other inmates. (*Id.*) These privileges continue to increase until finally, in Phase 1, inmates are granted general population privileges. (*Id.* at 4, 14.)

This description, however, comes from a handbook released at an unspecified date in 2022. (*Id.* at 1.) Wetzel's July 2021 letter overlapped with part of the handbook, primarily in guaranteeing all IMU inmates two hours out-of-cell exercise,

---

[26]    Williams's own statements in this litigation undercut his claim about being in solitary confinement and lacking "all meaningful human contact." (SAC ¶ 88(G).) According to Williams, while at SCI Benner, he talked to several different inmates who told him about comments Booher and Marsh made, (Pl. Resp. Exs. 3–5, pp.68–74), and he also had a "habit of having inmates read his grievances," watch him deposit them in the lock-box, and, if possible, provide declarations to support his claims, (Pl. Supp. Resp. at 11; Pl. Supp. Resp. Exs. B–E, pp.71–77).

seven days a week.  *See* (July 8 Letter at 2).  But it is unclear whether that memo was implemented at SCI Phoenix, when exactly the IMU (and Williams's time there) began, and the conditions to which *Williams himself* was subject before full implementation of the IMU program.[27]  Nor does the record indicate whether Williams's actual conditions accorded with the handbook's directives.

Alone, Williams's bare assertions that he was in solitary confinement — about which he provides no detail — cannot show that he was deprived of "the minimal civilized measure of life's necessities" or "incarcerated under conditions posing a substantial risk of serious harm."[28]  Even where the record contains some evidence of his conditions, a reasonable jury could not find that they satisfied this element.  *Cf. Batchelor v. Little*, No. 22-1340, 2022 WL 16749039, at *2, 9 (E.D. Pa. Nov. 7, 2022) (finding inmate in IMU Phase 4, who had been on RRL for several years prior to IMU placement, could not satisfy the objective prong); *Rosario v. Wetzel*, No. 23-699, 2025 WL 755516, at *4–5 (W.D. Pa. March 10, 2025) (similar); *Bramble v. Wetzel*, No. 20-2394, 2022 WL 55021, at *10 (M.D. Pa. Jan. 5, 2022).

---

[27]    An inmate generally keeps previously PRC-granted privileges after transferring.  (ADM 802 § 3(A)(9)(a).)  An inmate in a special program is subject to the program's guidelines, (*id.*), and although the record suggests that Williams would have been allowed to retain his prior privileges, *see* (July 8 Letter) ("If you are already receiving more than what is listed below, your allotments will not be impacted."), this is never clearly stated.
        But as is the case with respect to his incarceration at SCI Benner, Williams's statements in this litigation undercut his claims of a lack of meaningful contact with others by suggesting that during the summer and fall of 2021 he was able to speak to inmates about his grievance filings.  *See* (Pl. Supp. Resp. at 23; Pl. Supp. Resp. Exs. P–R, T).

[28]    The absence of specific allegations distinguishes this case from *Watson v. Wetzel*, No. 23-3246, 2024 WL 5096209 (E.D. Pa. Dec. 12, 2024).  *See id.* at *5–6 (denying summary judgment where inmate brought as-applied challenge, alleged specific facts about his confinement in his complaint, and — as here — defendants failed to provide evidence of his specific conditions, instead "attempt[ing] to draft behind Judge Savage's decision in *Wayne v. Wetzel*").

C

As for the second element of Williams's Eighth Amendment claim, Wetzel knew of the risks posed by long-term solitary confinement.  *See* (Wetzel Dep. at 18:17–23:19); *see also Porter*, 974 F.3d at 445–46.  But nothing in the record shows Wetzel knew of Williams's conditions (whatever they were) or inferred from them that the risks of prolonged solitary confinement were at play.  Nor does the record indicate that Wetzel knew facts from which he could have inferred that Williams, specifically, should not be in the RHU.  *See* (2021 RRL Review at 42, 44) (April 2020 psychological evaluation stating there were no contraindications for RRL or RHU); *see also* (May 2021 Psychological Evaluation at 3); (2021 RRL Review at 28–34) (ICAR records indicating generally no mental health concerns reported or observed); (ICAR Records) (same).

Moreover, the record does show that when Wetzel placed Williams on the RRL in 2019, Williams had a lengthy history of assaults and disorderly behavior.  *See* (RRL Interim Interview; 2021 RRL Review at 3, 46–55).  Although he had progressed to the first phase of STGMU and been placed in general population, he was sent back to STGMU housing due to misconduct.  (ICAR at 10.)  Prison staff ultimately requested his removal from STGMU and placement on the RRL after he assaulted two staff members in June of 2019.  (RRL Interim Interview; 2021 RRL Review at 34.)  Although there is no inherent termination date for RRL or AC status, Wetzel's intent was not for inmates to remain there indefinitely — and within eighteen months of Williams's placement, after a year of misconduct-free behavior, he was transferred to SCI Phoenix to begin the IMU, a program designed to enable inmates to return to general population.  *See* (Wetzel Dep. at 9:24–10:15, 59:16–63:11) (describing the IMU's purpose

and explaining that he placed no one in the program who "didn't have the potential" to succeed and be released to general population).

No reasonable jury could find that Wetzel was deliberately indifferent where the record does not show that Wetzel knew of Williams's conditions or lacked a legitimate penological purpose when placing and then keeping Williams in conditions more restrictive than general population. *Cf. Batchelor*, 2022 WL 16749039, at *9–10 (distinguishing *Porter* because "Batchelor [did] not present any evidence the [Defendants] knew four years on the [RRL] has detrimental health impacts" and the record showed he was placed on the RRL "because of [his] misconduct"); *Rosario*, 2025 WL 755516, at *5 (concluding that although the inmate disputed some of his disciplinary history, "[t]he uncontroverted record" showed he was "transferred to the RHU or placed on the RRL randomly . . . as a result of multiple violent episodes both before and after he was moved to restrictive housing").

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
Gerald J. Pappert, J.